FREEMAN UNITED COAL MINING COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (Mary Naylor, Widow of Bob Naylor, Deceased, Appellee).

Fifth District (Industrial Commission Division)    No. 5—99—0703WC

Opinion filed November 16, 2000.

Kenneth F. Werts and Julie A. Webb, both of Craig & Craig, of Mt. Vernon, for appellant.

Harold B. Culley, Jr., of Culley & Wissore, of Raleigh, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, Mary Naylor, the surviving spouse of Bob Naylor (decedent), filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 *et seq.* (West 1998)), seeking benefits from Freeman United Coal Mining Company (Freeman). After a hearing, an arbitrator awarded the claimant benefits under section 7 of the Act (820 ILCS 310/7 (West 1998)) and ordered Freeman to pay the claimant $1,750 for the decedent's funeral expenses. On review, the Industrial Commission (Commission) affirmed and adopted the arbitrator's decision. Freeman sought judicial review of the Commission's decision in the circuit court. The circuit court confirmed the Commission's decision, and this appeal followed.

The "Request for Hearing" which was executed by the attorneys representing the parties to this claim and which is contained in the record reflects that the only items in dispute at the hearing were the questions of: (1) whether the decedent's death was causally connected to his employment by Freeman, specifically whether the decedent's death was causally related to his exposure to an occupational disease, and (2) the amount of the decedent's average weekly wage as

calculated pursuant to the Act. When the parties appeared before the arbitrator on March 25, 1998, he stated that the issues for determination were causation and average weekly wage. At that point in the proceeding, Freeman's attorney stipulated to the claimant's calculation of the decedent's average weekly wage, leaving causation as the only disputed issue. Thereafter, the hearing commenced, and the following evidence was adduced.

The decedent died on March 4, 1985. Prior to his retirement from Freeman's employ on August 13, 1983, the decedent worked as a coal miner for approximately 19¹/₂ years. During that time, he was exposed to coal dust. After his retirement from Freeman's employ, the decedent did not work.

The claimant testified that the decedent experienced breathing problems prior to the time that he retired and for a period of four to five years before he died. She testified that he was treated by Dr. Moskoff, who prescribed medication that the decedent took up until his death. According to the claimant, the decedent's breathing problems became progressively worse, requiring increased medication. The claimant admitted that the decedent smoked about a pack of cigarettes each day for most of his adult life but stated that he stopped smoking five to seven years before he died.

Dr. Moskoff, a board-certified family practitioner, was the decedent's treating physician. His testimony was taken at an evidence deposition on March 6, 1998, some 19 days before the hearing before the arbitrator. Dr. Moskoff testified that he could not recall when he first treated the decedent, nor could he testify as to the dates upon which he treated the decedent. He explained that his records had been destroyed in a fire. The only records that Dr. Moskoff was able to produce were those he obtained from Herrin Hospital, the latest being for an admission in 1972. Dr. Moskoff testified that, according to the records at his disposal, the first time it was documented that the decedent had pulmonary problems was during his 1972 hospitalization. Thereafter, according to Dr. Moskoff's recollection, the decedent complained of shortness of breath, especially with exertion. Dr. Moskoff stated that he treated the decedent for both heart problems and pulmonary disease. On direct examination, the claimant's attorney asked Dr. Moskoff if, based upon his recollection, the decedent had coal workers' pneumoconiosis (CWP). At that point in the deposition, Freeman's attorney interposed an objection pursuant to section 12(a) of the Act (820 ILCS 310/12(a) (West 1998)) and stated that he had a continuing objection to Dr. Moskoff's testimony. Over that objection, Dr. Moskoff testified that the decedent "apparently" suffered from CWP caused by exposure to coal dust in combination with cigarettes.

Dr. Moskoff stated that the decedent's pulmonary condition aggravated his heart problems. Dr. Moskoff was of the opinion that the decedent's CWP, chronic bronchitis, and chronic obstructive pulmonary disease (COPD) were contributing factors in his death.

At the request of the claimant's attorney, Dr. Saeed Kahn reviewed the decedent's medical records, including pathology reports, and the deposition of Dr. William Getty, who examined the decedent on April 27, 1984. Dr. Kahn is board certified in internal medicine and served as the director of the cardiopulmonary laboratory at Franklin Hospital in Benton, Illinois. Dr. Kahn testified that the decedent suffered from chronic bronchitis, emphysema, and CWP. Dr. Kahn was of the opinion that the decedent's chronic bronchitis and emphysema were caused by smoking and coal mining. He stated that the decedent's emphysema and CWP aggravated his heart condition and contributed to his death. He could not say, however, that the decedent would have survived his heart attack on March 4, 1985, if he had had normal lungs.

Dr. Joe Garcia, examined the decedent's medical records at the request of Freemen. Dr. Garcia is board certified in internal medicine, pulmonary medicine, and critical care medicine, and he directs the occupational lung center at Indiana University. Dr. Garcia testified that the decedent died as the result of cardiovascular disease which was unrelated to coal dust exposure. He stated that, based upon the records he reviewed, he found no evidence of any pulmonary impairment which contributed to the decedent's fatal heart attack. According to Dr. Garcia, the results of the pulmonary function testing Dr. Getty performed on the decedent 11 months prior to the decedent's death were not abnormal. Dr. Garcia testified that the decedent's shortness of breath and cough were due to an insufficient coronary flow. Due to the long latency period for CWP, Dr. Garcia was of the opinion that any abnormal pulmonary function from which the decedent may have suffered in the last year of his life was not due to coal dust exposure. Dr. Garcia admitted, though, that chronic bronchitis, emphysema, and CWP can aggravate an existing heart condition.

Dr. William Getty, a board-certified internist, examined the decedent on April 27, 1984, at Freeman's request. At the time of that examination, the decedent complained of difficulty breathing, difficulty which had gradually increased over a period of 10 years. The decedent told Dr. Getty that his breathing problems interfered with his ability to sleep and that he could not work around his home for more that 20 to 30 minutes without resting. Dr. Getty ordered an X ray of the decedent's chest and testified that both he and his consulting radiologist interpreted the X ray as consistent with CWP. He testi-

fied, though, that the decedent did not suffer from any pulmonary function disability. According to Dr. Getty, the decedent's pulmonary function tests were between normal range and early minimal change and were consistent with COPD or chronic bronchitis. He testified that any pulmonary function disability that the decedent suffered was "probably" not related to CWP. According to Dr. Getty, the decedent suffered from hypertensive cardiovascular disease. Dr. Getty was of the opinion that the decedent's COPD was primarily caused by smoking, but admitted that coal dust was a causative factor.

Dr. James Dove, who is board certified in both internal medicine and cardiovascular disease, also reviewed the decedent's medical records at the request of Freeman. He did not, however, review any pathology slides or X rays. Dr. Dove testified that the decedent's death was caused by either an acute heart attack or a fatal cardiac arrhythmia caused by coronary disease, not lung disease. On cross-examination, however, Dr. Dove agreed that the decedent's lung condition could have been a causative factor in his death. According to Dr. Dove, the decedent's postmortem examination revealed significant injury to his heart muscle. Nothing, in Dr. Dove's opinion, suggested that the decedent's cardiac condition was caused by exposure to coal dust. He testified that he found no evidence that the decedent suffered from any pulmonary impairment. He did find evidence of chronic lung disease, which he believed was caused by the decedent's cigarette smoking and his coronary artery disease. According to Dr. Dove, the tests performed on the decedent 11 months prior to his death revealed very minimal obstructive pulmonary disease and good airflow and diffusion capacity.

The record contains two pathology reports. Dr. Mina Gabrawy performed an autopsy upon the decedent on March 5, 1985. In his report, Dr. Gabrawy noted severe coronary atherosclerosis, mild to moderate anthracosilicosis, and possible bronchopneumonia. His report does not, however, discuss the impact that any pulmonary disease might have had upon the decedent's death.

The second pathology report was authored by Dr. Joseph C. Eggleston, director of surgical pathology at John Hopkins Hospital. Dr. Eggleston's report states that the decedent suffered from severe coronary atherosclerosis with up to a 90% narrowing of the vessel lumens. He opined that the decedent's death was related to his coronary disease. Dr. Eggleston found a moderate degree of emphysema, but found no evidence of CWP. According to Dr. Eggleston's report, if the decedent suffered from any pulmonary disability during his lifetime, it would have been attributed to his moderate degree of emphysema.

The arbitrator overruled Freeman's section 12(a) objection to Dr.

Moskoff's opinion testimony, finding section 12(a) inapplicable. The arbitrator awarded the claimant benefits under the Act. In doing so, he made several findings that Freeman now asserts are against the manifest weight of the evidence, namely that: (1) the decedent suffered from an occupational disease that arose out of and in the course of his employment by Freeman; (2) the decedent suffered a disabling condition of ill-being that was causally related to his occupational disease; and (3) the decedent's death was causally related to his occupational disease.

Freeman filed a petition seeking a review of the arbitrator's decision by the Commission. In that petition, it claimed that the arbitrator erred in overruling its section 12(a) objection to Dr. Moskoff's testimony and erred in finding that the decedent suffered from: (1) an occupational disease covered by the Act; (2) a disease that arose out of his employment; and (3) a disease that arose in the course of his employment. In the "Statement of Exceptions" it filed with the Commission, Freeman also argued that, although there was evidence that the decedent had CWP, he was not disabled by the disease and it was not a causative factor in his death. On review, the Commission affirmed and adopted the arbitrator's decision. Freeman sought judicial review, and the circuit court confirmed the Commission's decision.

Freeman raises three arguments on appeal, namely: (1) that the Commission erred in permitting the decedent's treating physician, Dr. Moskoff, to offer opinion testimony that the decedent suffered from an occupational disease and that the occupational disease contributed to his death; (2) that the Commission's finding that the decedent's occupational disease was causally related to his death is against the manifest weight of the evidence; and (3) that the Commission's finding that the decedent suffered a disability that was causally related to his occupational disease is against the manifest weight of the evidence.

We first consider Freeman's contention that the trial court erred in allowing Dr. Moskoff to testify that, in his opinion, the decedent suffered from an occupational disease that contributed to his death. Freeman argues Dr. Moskoff's testimony should have been barred under section 12(a) of the Act (820 ILCS 310/12(a) (West 1998)). Section 12(a) provides, in pertinent part, as follows:

> "In all cases where the examination is made by a physician or surgeon engaged by the employee, and the employer has no physician or surgeon present at such examination, it shall be the duty of the physician or surgeon making the examination at the instance of the employee, to deliver to the employer, or his representative, a statement in writing of the condition and extent of the examination and findings to the same extent that said physician or surgeon

reports to the employee and the same shall be an exact copy of that furnished to the employee, said copy to be furnished the employer, or his representative, as soon as practicable but not later than the time the case is set for hearing. Such delivery shall be made in person either to the employer, or his representative, or by registered mail to either, and the receipt of either shall be proof of such delivery. If such physician or surgeon refuses to furnish the employer with such statement to the same extent as that furnished the employee, said physician or surgeon shall not be permitted to testify at the hearing next following said examination." 820 ILCS 310/12(a) (West 1998).

Freeman argues that it was entitled to a written report containing Dr. Moskoff's opinions without regard to whether he furnished any report to the claimant and, in the absence of any such report, his testimony should have been limited to matters reflected in the medical records he produced. We disagree.

■ The interpretation of a statute is a question of law. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961 (1995). Consequently, on review of an administrative agency's decision, courts are not bound by the agency's interpretation of a statute. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97, 606 N.E.2d 1111 (1992). If the language of the statute is clear and unambiguous, the court must interpret the statute according to its terms without resorting to aids of construction. *Branson*, 168 Ill. 2d at 254. If, however, the statute is ambiguous, substantial weight will be given to the manner in which the agency charged with its enforcement has interpreted it. *Abrahamson*, 153 Ill. 2d at 97-98. The initial question of whether a statute is ambiguous is also one of law and subject to a *de novo* determination on review. *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, 312 Ill. App. 3d 182, 190, 726 N.E.2d 65 (2000).

■ We find nothing ambiguous about section 12(a). A physician making an examination at the request of an employee must deliver to the employer, or its representative, a written report of that examination "to the same extent" that he or she reports to the employee "and the same shall be an exact copy of that furnished to the employee." 820 ILCS 310/12(a) (West 1998). It follows from the clear language of the statute that, if no written report is made to the employee or his representative, then none need be delivered to the employer. We, therefore, agree with the Commission's interpretation of this statute. However, there is a wholly separate reason supporting the Commission's decision to affirm the arbitrator in overruling Freeman's objection to Dr. Moskoff's opinion testimony.

■ Section 12(a) requires a refusal on the part of the physician to deliver a report to the employer before his or her testimony is to be excluded. *Nollau Nurseries, Inc. v. Industrial Comm'n*, 32 Ill. 2d 190, 193, 204 N.E.2d 745 (1965). In this case, there was no such refusal.

■ To refuse is "to show or express a positive unwillingness to do or comply." Webster's Third New International Dictionary 1910 (1981). Dr. Moskoff's unrebutted testimony reveals that his office records were destroyed by fire. He did not refuse to deliver any records to Freeman; he had none of his own records to deliver. Whatever records that Dr. Moskoff was able to obtain from Herrin Hospital were made available to both the claimant and Freeman. Nothing in this record even suggests that Dr. Moskoff showed or expressed a positive unwillingness to deliver the records of his medical treatment of the decedent. Consequently, the refusal prerequisite to an application of section 12(a) is absent in this case, and Freeman's objection was properly overruled.

■ Freeman next argues that the Commission's finding of a causal connection between the decedent's death and any occupational disease is against the manifest weight of the evidence. The issue of whether a causal relationship exists between a claimant's employment and his injury is a question of fact to be determined by the Commission. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954 (1984). Death is compensable under the Act so long as the decedent's employment was a causative factor. His employment need not be the sole cause or even the primary cause; it is sufficient if it is a cause. *Sears, Roebuck & Co. v. Industrial Comm'n*, 79 Ill. 2d 59, 66, 402 N.E.2d 231 (1980).

The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005 (1987). Whether we might reach the same conclusion is not the test of whether the Commission's determination of a question of fact is against the manifest weight of the evidence. The appropriate test is whether there is sufficient evidence in the record to support the Commission's finding. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

The testimony of Drs. Moskoff, Kahn, and Getty supports the finding that the decedent suffered from CWP, chronic bronchitis, emphysema, and COPD. Although Dr. Eggleston did find a moderate degree of emphysema, both he and Dr. Garcia were of the opinion that the decedent did not suffer from CWP. Dr. Gabrawy's autopsy report noted that the decedent had mild to moderate anthracosilicosis. Drs. Moskoff and Kahn found a causal relationship between the decedent's

pulmonary problems and his death. Both testified that the decedent's pulmonary condition aggravated his heart condition. Specifically, Dr. Moskoff was of the opinion that the decedent's CWP, chronic bronchitis, and COPD were contributing factors in his death, and Dr. Kahn opined that the decedent's emphysema and CWP contributed to his death. Dr. Moskoff testified that the decedent's CWP was caused by coal dust exposure. Dr. Kahn stated that the decedent's chronic bronchitis and emphysema were both caused, in part, by coal mining. Drs. Garcia and Dove testified that the decedent died as a result of coronary disease, unrelated to coal dust exposure, and Dr. Eggleston's report reflects the same opinion.

Without question, the Commission had before it contradictory medical testimony going to the issue of whether the decedent suffered from any occupational disease and whether, if he did, there existed any causal relationship between that condition and his death. As in any case, it was for the Commission to weigh the contradictory evidence and resolve those factual issues, and its determination will not be disturbed on review unless contrary to the manifest weight of the evidence. *Material Service Corp. v. Industrial Comm'n*, 97 Ill. 2d 382, 387, 454 N.E.2d 655 (1983).

In this case, the Commission, by adopting the arbitrator's decision, found that the bulk of credible evidence supports the conclusion that the decedent suffered from occupational lung disease in the form of CWP, anthracosilicosis, chronic bronchitis, emphysema, and COPD and that his occupational disease played a causative role in his death. Further, as the arbitrator correctly noted, the claimant is entitled to the benefit of the presumptions set forth in section 1(d) of the Act (820 ILCS 310/1(d) (West 1998)) by reason of the decedent's 19½ years of work in coal mines. Section 1(d) provides, in pertinent part:

> "If a miner who is suffering or suffered from pneumoconiosis was employed for 10 years or more in one or more coal mines there shall, effective July 1, 1973[,] be a rebuttable presumption that his or her pneumoconiosis arose out of such employment.
>
> If a deceased miner was employed for 10 years or more in one or more coal mines and died from a respirable disease there shall, effective July 1, 1973, be a rebuttable presumption that his or her death was due to pneumoconiosis." 820 ILCS 310/1(d) (West 1998).

These presumptions, coupled with the medical evidence supplied by Drs. Moskoff, Kahn, and Getty, lead us to conclude that the Commission's decision that the decedent suffered from an occupational disease that was causally related to his death is not against the manifest weight of the evidence.

■ The final issue raised by Freeman is its contention that the

Commission's finding that the decedent suffered a disability that was causally related to an occupational disease is against the manifest weight of the evidence. There is no doubt that the arbitrator made such a finding and that the Commission adopted it. The relevancy of that finding in the context of a claim brought by a surviving spouse for benefits for the period commencing on the date of the decedent's death is questionable. No claim was made in this case for any benefits premised upon any disability suffered by the decedent during his lifetime. This claim is based solely upon the decedent's death.

Freeman acknowledges that the claimant produced evidence that the decedent had CWP but argues that she failed to prove that he was disabled as a result of the disease. As noted earlier, the Commission's determination that the decedent's death was causally related to his occupational disease is not against the manifest weight of the evidence. We are at a loss to understand what more the claimant needed to establish other than the fact that the decedent's occupational disease arose out of and in the scope of his employment by Freeman, a fact that Freeman did not contest at the arbitration hearing. Aside from Freeman's failure to contest the question of whether the decedent's occupational disease arose out of and in the course of his employment, the Commission's finding that it did is amply supported by the testimony of Drs. Moskoff and Kahn.

For the foregoing reasons, we affirm the trial court's order confirming the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and COLWELL, HOLDRIDGE, and RARICK, JJ., concur.